**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PROFESSOR LOUISE-ANNE MCNUTT,**

**Plaintiff,**

vs.                                                                          **1:10-CV-1301**
**(MAD/RFT)**

**PHILIP NASCA, individually and as Dean of the**
**School of Public Health, and STATE UNIVERSITY**
**OF NEW YORK AT ALBANY,**

**Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

CREIGHTON, JOHNSEN & GIROUX              Jonathan G. Johnsen, Esq.
560 Ellicott Square Building
295 Main Street
Buffalo, New York 14203
_Attorneys for Plaintiff_

ERIC T. SCHNEIDERMAN                      James Seaman, Esq.
Attorney General of the State of New York
The Capitol
Albany, New York 12224
_Attorney for Defendants_

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

Plaintiff Louise-Anne McNutt ("McNutt" or "plaintiff") commenced this action alleging

that her employers, defendants Philip Nasca ("Nasca") and State University of New York at

Albany ("SUNY Albany" or "the University") unlawfully discriminated against her in violation

of Title VII of the Civil Rights Act of 1962, as amended, 42 U.S.C. § 2000e et seq., ("Title VII");

the Equal Pay Act, 29 U.S.C. § 206 ("EPA"); New York State Executive Law § 290 et seq. ("New

York State Human Rights Law" or "NYSHRL"); and the Fourteenth Amendment Equal

Protection Clause.  Presently before the Court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 25).  Plaintiff has opposed the motion. (Dkt. No. 29).

**BACKGROUND**[1]

School of Public Health

In 1985, the School of Public Health ("SPH") was created as a collaborative endeavor between the State University of New York ("SUNY") and the New York State Department of Health ("DOH").  There are four academic departments within the SPH: Epidemiology and Biostatistics ("Epi-Bio"); Biomedical Sciences; Environmental Health Sciences; and Health, Policy Management and Behavior.   Assistant professors or "junior faculty" at SPH are hired to work nine months per year under a three year contract and are not tenured.  Toward the end of their second three-year contract, the assistant professor can seek promotion and continuing appointment ("P & C") to the rank of associate professor.  If successful, the individual is promoted to associate professor and granted tenure.  Each professor is assigned a faculty office in the SPH.  Space is not guaranteed to faculty but allocated based upon funded research needs. Professors with externally funded research may request the assignment of cubicle offices for graduate assistants who are employed to work on those externally funded grants.  Faculty members who have projects with New York State agencies under the terms of Memorandum of Understanding ("MOU") which includes budgeting for graduate assistants, usually have the graduate assistant physically work at the agency which is funding the MOU.

---

[1] Defendants filed a Statement of Material Facts and plaintiff properly responded. Plaintiff also set forth additional facts.  Defendants responded to these additional assertions in the reply submission.  To the extent that the "facts" asserted by plaintiff in the Statement of Material Facts are supported by the record, the Court will consider them in the context of the within motion.  The background set forth in this section is taken from: (1) defendants' Statements of Material Facts and plaintiff's responses therein; (2) the exhibits and evidence submitted by defendants in support of the motion for summary judgment; and (3) the exhibits and evidence submitted by plaintiff in opposition to the motion for summary judgment. The facts recited are for the relevant time period as referenced in the complaint.

When an MOU is entered into between the DOH and the University, the work to be done and the amount of money the University will received from DOH for the work are outlined. Generally, after the MOU is drafted, it is signed by a DOH representative and then by a SPH representative, typically the dean or his designee.  Finally, the MOU is signed by a representative of the Controller's office at the University.   Five original versions of the MOU are executed. Usually, once the MOU is finalized, the Controller forwards one signed original to the SPH, another to the professor's department, and another to DOH.  The remaining originals are retained by the Controller's office, one in purchasing and the other in accounting.  Nicole Malachowski ("Malachowski") was the Assistant Chair in Epi-Bio and responsible for managing the department's financial accounts created to handle funding for MOUs.  Malachowski typically receives the department's signed, originally executed MOUs.

In January 1995, plaintiff accepted a position as visiting professor at SUNY Albany.  In the Fall of 1997, plaintiff became an assistant professor at SUNY Albany.  At that time, David Strogatz ("Strogatz"), was the incoming department chair.  Strogatz told plaintiff "you have six years to prove yourself".  Plaintiff did not receive any written confirmation of that statement.   In 2002, plaintiff was granted a promotion and continuing appointment as a tenured professor.  Ed Fitzgerald ("Fitzgerald"), who was employed and teaching at the Epi-Bio Department at SPH at the time, voted in favor of plaintiff's promotion.

In the Fall of 2007, Philip Nasca was appointed Dean and the Head Administrator of the SPH.  At approximately the same time, Fitzgerald was appointed chair of the Epi-Bio Department.  Due to the trend in academia toward a greater reliance on research and attracting funding, Nasca lowered the minimum course load for professors from four courses to three courses per academic year to afford professors additional time for research.  In December 2007,

3

plaintiff began serving as associate chair in Epi-Bio and agreed to serve for two full years in exchange for being relieved of teaching one class during the Spring 2010 semester.  In January 2009 or February 2009, plaintiff resigned from the Associate Chair position.

Roxana Moslehi's Contract Renewal

When Nasca became Dean, all departments within the SPH, except the Epi-Bio Department, "rigorously reviewed" a junior faculty member's progress when determining whether the member was entitled to a second three-year contract.  At that time, Nasca directed Fitzgerald to employ "meaningful reviews" of all junior faculty.   Plaintiff, who was associate chair, was not informed of Nasca's "new policy" regarding the review process for assistant professor contract renewals.  At the May 21, 2008 faculty meeting, Assistant Professor Roxana Moslehi's ("Moslehi") contract renewal application was discussed.   The substance of the discussions during that meeting is largely disputed by the parties.[2]   Plaintiff was on sabbatical in the Republic of Georgia and did not attend the meeting.  Fitzgerald claims that Strogatz and Professor Larry Schell presented Moslehi's application to the faculty and that a female faculty member made a motion that Moslehi be approved for one year.  After a vote, Moslehi's contract was renewed for one year.[3]

In June 2008, plaintiff returned and complained to Fitzgerald about the process used for Moslehi's contract renewal and requested that he have it "re-done".  Fitzgerald refused.  During their conversation, Fitzgerald commented that Moslehi was not a "team player".

---

[2]  Plaintiff and defendants submit and rely upon the Meeting Minutes for the May 21, 2008 meeting. The minutes were annexed to counsel's declarations as Exhibit 55.  This exhibit was marked for use at the depositions in February 2012 however, the Court has reviewed the transcripts of plaintiff's deposition, Nasca's deposition and Fitzgerald's deposition and finds that the document is not in proper evidentiary form.  While the parties do not dispute the admissibility, the Court will not consider the document within the context of the within motion because it was not authenticated by any witness, it is not dated, it is not signed and it does not indicate who prepared the document

[3]  The record is devoid of any affidavit from any faculty member in attendance other than Fitzgerald.

Teaching Assistants

On July 22, 2008, Fitzgerald sent an e-mail to plaintiff regarding teaching assistant assignments:

> I've asked Judy to set-up a meeting to discuss TA assignments.  It would be good for you to attend if possible, since I would like to offer you a TA to help with 612.  Please let her know your availability.

During previous semesters, a teaching assistant had not been provided for Epi 612.

In August 2008, Fitzgerald held a meeting of professors who were scheduled to teach the core methods courses in Epi Bio that Fall.  Fitzgerald claims that Professors Strogatz, Erin Bell, Akiko Hosler and Kristin McClamoroch were in attendance.  Fitzgerald also claims that Malachowski attended the meeting.[4]  Plaintiff did not attend however, the parties dispute the reasons for plaintiff's absence and the sum and substance of what transpired during the meeting.[5]  During the meeting, the decision was made not to assign a teaching assistant to Epi 612 for the Fall 2008 semester.

Office Relocation

In January 2009, renovations began at the East Campus.[6]  The research space shared by the graduate students assigned to plaintiff and Strogatz was converted to a pantry for the department.  Thus, research staff for both professors was forced to relocate. At the relevant time, Strogatz was working as a principal investigator ("PI") on a $500,000.00 funded grant which included payment for several research staff.  Plaintiff requested space for one graduate assistant who was relocated to a new office on the second floor.  According to Larry Preston ("Preston"),

---

[4] The record is devoid of any affidavit from any of the attendees other than Fitzgerald.

[5] There are no documents or memoranda memorializing the minutes of the meeting

[6] Defendants claim that the faculty was presented with the renovation plans at a faculty retreat in June 2008. Plaintiff claims she was not notified of the renovation schedule until late January 2009.

the Assistant Dean of Administration in the SPH, plaintiff requested that the cubicle be secured with a door and a lock.  Preston claims that a lock and door were installed on February 23, 2009.[7]

Locked storage space was provided and faculty members were advised, but not required, to purchase a locking bar for individual cabinets since people had access to the secure area.   At that time, Moslehi had a second Epi-Bio faculty office.  Sometime after February 2009, Moslehi allowed plaintiff to store some research materials in Moslehi's Epi-Bio office.  Some months later, a secure records storage room was created directly across from plaintiff's office and her materials were relocated to that room.

Student Cheating Issue

On February 4, 2009, the Epi-Bio doctoral qualifying examination was held.  The graders for the examination were Kristin McClamroch, Michael Bloom and Fitzgerald.[8]  On February 3, 2009, the answer key for the exam was sent to those faculty members and Strogatz.  While the exams were being graded, the other graders advised Fitzgerald that they suspected that one student cheated based upon the similarity of the student's answers to the answer key as well as the order in which the answers were given.  Upon blind review, without knowing the name of the student, Fitzgerald identified the suspicious exam and, after identifying the student, spoke with Dean Nasca.  At the Dean's suggestion, the suspect examination was also reviewed blindly by Mary Applegate ("Applegate"), the Associate Dean for Academic Affairs.  Applegate was convinced that the doctoral student had cheated.   Nasca, Applegate and Fitzgerald met with the

---

[7] Plaintiff disputes this fact and cites to an e-mail date February 2, 2009.  The Court has reviewed the e-mail and finds that it does not support plaintiff's assertion that the "cubicle did not have a door or a lock" after February 23, 2009.

[8] Defendants allege that plaintiff was the exam coordinator.  Plaintiff disputes that fact and alleges that McClamroch was the coordinator.

student and Fitzgerald prepared a Violation of Academic Integrity Report, initiating the administrative review process at the University for adjudicating a disciplinary charge.   The report, dated March 4, 2009, stated that the student had access to the office of a faculty member who had the answer key.  Plaintiff was the student's advisor and provided her doctoral students with keys to her faculty office.   In a March 7, 2009 confidential e-mail to Nasca, plaintiff concluded that it was, "unequivocal that she cheated".   Nasca included plaintiff's March 7, 2009 e-mail with the materials he forwarded to the University panel deciding the student's case.[9] Plaintiff claims that she was prevented from speaking with the Dean or the student regarding the incident until after the student received her packet from the University.  On March 27, 2009, Fitzgerald sent an email to Clarence McNeill, an administrator involved in the student's disciplinary process, proposing several scenarios whereby the student may have gained access to the exam's answer key, i.e., by gaining access to the office of a faculty member; by accessing a faculty member's email; or directly from a faculty member.

On March 31, 2009, plaintiff sent an email to McNeill with the following information:

> For the record, I wish it understood that, on the request of the Dean,
> I did not speak with [ ] (except to state the Dean's request) prior to her
> receipt of a packet from the University containing, among other items,
> my confidential e-mail to the Dean.  When she received this, she
> called me.  In our brief meeting I listened to her explanation of her
> exam responses.  This conversation has made me less convinced that
> she cheated than I was when I wrote the confidential e-mail to the
> Dean.  At this time, it is difficult for me to see how the exam was
> written without having access to answers, yet it is equally difficult for
> me to see how answers were obtained.[10]

---

[9] Nasca states that he "did not release [the email] to the student".  However, in an email thread, marked as Exhibit 24 at plaintiff's deposition and identified by plaintiff, Nasca writes, "[t]he information was shared with the student in the interest of full disclosure and in light of her right to confront her accusers".

[10] Plaintiff authenticated this e-mail during her deposition.

The disciplinary panel determined that there was insufficient evidence to conclude that the student had cheated and no discipline was imposed.

<u>Plaintiff's March 2009 meeting with Provost Philips</u>

In December 2008 or January 2009, plaintiff accumulated data and created a table depicting the "Productivity by tenure status and university affiliation during doctoral degree". Plaintiff compared graduates from the University of North Carolina to graduates of other universities. Plaintiff identified the table during her deposition and testified that after she prepared the table, "it became clear it was also a gender issue". Plaintiff also stated, in an email to Nasca, "I do see the salary issue to be a gender issue. While the graduate institution issue complicates the picture, I do think I can make this case".[11]

During the week of March 26, 2009, without providing specifics, plaintiff complained to Provost Susan Philips about gender discrimination and about the events between July 2008 and March 2009. Plaintiff felt that she was being retaliated against for complaining about gender discrimination. Plaintiff testified that she either showed Provost Susan Philips, or gave her a copy of the table.

<u>Course Review Seminar</u>

On May 8, 2009, plaintiff attended a faculty meeting where the members discussed building student critical thinking skills. Fitzgerald asserts that the discussion led to the creation of a critical thinking, credit-bearing seminar for the following Fall semester. Fitzgerald claims that McClamroch volunteered to teach the seminar on Thursday evenings. Plaintiff alleges that prior to that meeting, she decided to teach a preparation course for the doctoral examination.

---

[11] Both parties cite to and annex Exhibit 25, a Memorandum to "The Record" created by Mary Applegate. The Memorandum is not in proper evidentiary form. Plaintiff disputes the accuracy of the report and therefore, the document will not be considered on the within motion.

Plaintiff asked her students to chose the workshop times. One of the times selected by plaintiff's students was Thursday evenings. Once the semester began and Fitzgerald became aware of the conflict, he sent an email to plaintiff "suggesting" that she reschedule her Thursday meeting time. Plaintiff claims she was "forced to change the time or refuse and risk being disciplined". Plaintiff did not resolve the scheduling conflict and refused to change the meeting time. Plaintiff was not disciplined as a result of the incident.

<u>Plaintiff's August 2009 Meeting with Applegate and Fitzgerald</u>

On August 7, 2009, plaintiff met with Applegate and Fitzgerald to address various concerns and complaints. During the meeting, the parties discussed complaints Fitzgerald received from students against plaintiff, including one from a student TA. Plaintiff admitted that she told the students in one of her classes that they were "acting pathetic" and admitted that there was an issue with "students with accents".

On August 10, 2009, plaintiff sent an email to Applegate which stated, *inter alia*[12]:

> You requested at the meeting that I produce a writing which specified items I wanted addressed. This letter contains those items. I initially informed Dean Nasca of significant issues in December 2008. The issues were communicated in an email to Dean Nasca on February 16, 2009, and cc: to Dr. Fitzgerald. They were also discussed with the Provost's office last March.

Plaintiff addressed four requests: (1) the need for hostility and harassment to end; (2) a $20,000.00 per year salary increase; (3) a graduate assistant for the 2009 - 2010 academic school year; and (4) that plaintiff be appointed Applied Infectious Disease Epidemiology Program Director. Plaintiff also asked for a resolution of the exam situation; a fair distribution of office

---

[12] Plaintiff authenticated the email during her deposition.

space and the opportunity to transfer to a different part of the University if the hostility did not cease.

On August 14, 2009, Applegate responded to plaintiff's email.[13]  Applegate agreed to monthly meetings with plaintiff but referred salary discussions to Nasca and advised that she was unable to guarantee plaintiff a graduate student.  Applegate also advised plaintiff that until there was an approved certificate for applied epidemiology, the University would not assign a faculty member to be the certificate director.  However, she stated that, "the directorship is something we'll discuss again when the certificate has been developed and approved".

Grievance Process for Grades

On November 2, 2009, plaintiff sent an email to William Hedberg supporting a grievance filed by one of her doctoral student's, MB.  Plaintiff stated that the student was "defeatist in the morning before receiving the exam and more so upon seeing the questions".  Plaintiff decided that the student's failure was the result of bias on the part of the faculty who graded the exam.  The graders were Strogatz and Professor McLaughlin, a female who works at DOH.  Fitzgerald and Nasca found no evidence to overrule the opinion of the graders.  In order to address the student's concerns, Nasca agreed to personally administer a new take home examination to the student. She passed his examination and has since successfully defended her dissertation and been awarded a doctoral degree in epidemiology.

One-Credit Class for Spring 2010

---

[13]Applegate did not provide an affidavit authenticating the email.  However, plaintiff does not dispute that she received the email in response.

In November 2009, Fitzgerald asked plaintiff to teach a one-credit class in the Spring of 2010.[14]   Fitzgerald took the position that because plaintiff worked only one year as associate chair, plaintiff had earned only half a course buy-out and that teaching a one credit course was fair to plaintiff and the other faculty.   The class met for one hour once a week.  Plaintiff had taught only one other course that academic year.   From Fall 2007 through Summer 2010, plaintiff, Strogatz and Fitzgerald taught eight courses.

Response from Female Colleagues

On October 5, 2009, plaintiff filed a complaint with the New York State Division of Human Rights ("DHR") alleging sexual discrimination and retaliation.  On December 30, 2009, plaintiff's counsel submitted a letter to the New York State Division of Human Rights in rebuttal to a letter submitted by counsel for the University.  In the letter, plaintiff's counsel alleged:

> In her Department, there are two male tenured professors, two female tenured professors and four non-tenured female professors.  The male professors are paid significantly more than the female professors, including Ms. McNutt.  In addition, newer faculty hires far junior to Ms. McNutt receive salaries at a small distance from her salary, while her salary remains substantially different from the men.  Ms. McNutt complained about this fact, pointing out that junior faculty members are being rewarded for being submissive to men in the department, while she is being discriminated against for not being submissive to them.

Fitzgerald showed the letter to some female faculty members including Nicky Malachowski, Erin Bell, Akiko Hosler, Lenore Ginsberg and Mary Gallant.  Fitzgerald also discussed the issues raised in the letter with the aforementioned female faculty members and asked them if they agreed with plaintiff's contentions and asked if they felt that gender discrimination was rampant at the school.  Fitzgerald testified that all of the women disagreed

---

[14] While plaintiff "disputes that the agreement was to be relieved of a course specifically in Spring 2010", the Court finds this is not supported by the record and further, plaintiff previously "admitted" this fact in ¶ 20 of her Response to Defendant's Material Statement of Facts.

with that statement.  Fitzgerald asked the women if they would be willing to submit a letter to rebut the allegations in defense of the school.  Fitzgerald testified that, "they all said, yes, they would be happy to do so".[15]

In February 2010, Erin Bell, Nicole Malachowski, Kristin McClamroch, Akiko Hosler, Lenore Ginsburg, Mary Applegate and Mary Gallant provided written statements in which they sought to dispel the notion that they were "submissive" females.[16]

MOU 418

In March 2010, a dispute arose regarding MOU 418.   The MOU Workplan Brief contained the following description:

> The MOU will provide consulting on epidemiologic methods and related statistical analysis to the NYSDOH Bureau of Sexually Transmitted Disease Control and its research scientists.  Dr. McNutt will provide general educational trainings for Bureau staff, as requested by staff members, related to specific epidemiological projects undertaken by the Bureau.  Additionally, she will assist on program activities of the Bureau that need epidemiological and statistical expertise.

The Budget for the MOU included $41,097 designated for Faculty/Director, $18,033 for "Fringe Benefits" and $8,870 for "indirect costs".  The agreement began on April 1, 2009 and terminated on October 31, 2010.   The agreement was executed on November 30, 2009 by James Clyne, Executive Deputy Commissioner for the DOH.  The agreement was signed by Applegate on behalf of Nasca on March 9, 2010.

---

[15] The record does not contain any affidavits or sworn statements from any of the aforementioned female faculty members.

[16] The letters are annexed to the moving papers at Exhibit 38 but are not in proper evidentiary form.  Plaintiff does not dispute the authenticity of the letters.  Accordingly, the letters will be considered in the context of the within motion.

On March 22, 2010 and March 23, 2010, Sophia Hammett-Turner, an employee at the Controller's Office, sent e-mails regarding the budget and accounting for MOU 418 to Malachowski, Deborah Oriola and Scott Pleat, an employee in the Purchasing and Contracts office.   On March 24, 2010, plaintiff sent an e-mail to Hammett Turner memorializing a conversation.  The e-mail was copied to Deborah Bowe and Scott Pleat.  Plaintiff wrote:

> As soon as it is signed, please ask Mr. Wilcox's office to contact me
> and I will pick up the documents and process them asap.

Hammett-Turner responded and plaintiff returned the email, with a copy to Malachowski, Oriola and Pleat, thanking Hammett-Turner for her help and advising that she would follow with Pleat the next day.

On March 24, 2010, the agreement was executed by Kevin C. Wilcox, Associate Vice President and Controller.[17]

In February 2011, plaintiff approached Deborah Oriola, the Financial Staff Assistant to Larry Preston, with two original versions of MOU 418.  Oriola claims that plaintiff asked for help billing the MOU.  At that time, Oriola and Malachowski did not have a full executed copy of MOU 418.   Oriola attempted to help plaintiff and telephoned her contact at DOH.  Oriola was told that DOH had no available funds to pay for $43,000.00 in expenditures incurred prior to March 31, 2010 because it had closed its fiscal books for 2009 on March 31, 2010.  However, funds were available for the remaining $25,0000.00 in expenditures incurred during the 2010 fiscal year.   As a result, plaintiff lost $43,000.00.

Salaries in the SPH

---

[17] There is no evidence authenticating signatures or document.

The following table contains the name, rank and salary for professors in the Epi-Bio Department at SPH[18]:

| Name | Rank | Salary 2007 | Salary 2011 | Difference |
|------|------|-------------|-------------|------------|
| Fitzgerald | Assistant Professor | 91,225 | 126,506 | 35,281 |
| Kuznetsov | Assistant Professor | 80,475 | 98,944 | 18,469 |
| Stratton | Professor | 97,792 | 116,018 | 18,826 |
| Zurbenko | Professor | 116,217 | 132,957 | 16,740 |
| Strogatz | Associate Professor | 92,003 | 108,919 | 16,916 |

In October 2008, Nasca requested a discretionary salary increase ("DSI") on plaintiff's behalf from the Provost's pool.  In March 2009, plaintiff and University officials discussed plaintiff's salary issues.  University officials offered plaintiff a $5,000.00 increase.  The parties disagree on whether plaintiff accepted or rejected that offer.  On September 1, 2009, Nasca responded to plaintiff's demand for a $20,000.00 raise in a memorandum to plaintiff.  Nasca determined that it was not warranted and provide several reasons for his decision.  Nasca noted:

> I have completed my assessment of your request for a $20,000 salary adjustment.  My evaluation is based on a review of your salary and productivity history relative to the other two associate professors in the epidemiology program.  The productivity assessment is based on the "Equitable Consideration" principle which allows faculty to contribute to the overall benefit of the faculty member's department, school, and university through a variety of academic, scholarly, and service efforts.

In November 2010, plaintiff received a $5,000.00 increase in her salary.

As of December 2011, Igor Kuznetsov, a male associate professor, earned a salary of $99,964.00.  Professor Kuznetsov is a practitioner in the field of bioinformatics.  Professor Kuznetsov has eight years of seniority, has earned three NIH grants on which he is the PI, totaling

---

[18] The parties do not dispute the data contained in this table.  However, plaintiff alleges that Professor Strogatz earned $107,919.00 in 2011.  Defendants assert that his salary was $108,919.

$240,000.00. Professor Kuznetsov also received $141,266.00 in funding through the U.S. National Library of Medicine and a grant from the National Institute of General sciences in the amount of $227,250.00.

As of December 2011, Timothy Hoff, a male associate professor in the Department of Health Policy Management and Behavior earned a salary of $113,747.00. Hoff's rank is comparable to plaintiffs. In 2010, Professor Hoff published a book which received favorable reviews. Hoff was named as a PI on one grant for $20,000.00 and as a subcontractor on two other grants in the amount of $140,000.00 over the past five years. Hoff was also a PI on an award from the Agency for Healthcare Research and Quality in the amount of $99,906.00. Hoff also served as co-investigator for a funded project from the National Institute of Allergy and Infectious Diseases/Harvard Pilgrim Health Care for the period of July 2009 through June 2011 in the amount of $96,200.00.

As of December 2011, Doug Conklin, a male associate professor earned $138,180.00. Conklin had 18 years seniority with eight at the University and worked in the Department of Biomedical Sciences as a bench science. From 2007 to the present, Conklin has received $2,000,000.00 in funding. Provost Phillips extended a retention offer to Conklin in the amount of $125,000.00 in March 2009. Conklin agreed to stay at the University.

Professor Chittibabu Guda was named as PI on a million dollar NIH grant as an assistant professor. In August 2009, Professor Guda received a competing offer from the Medical College of Georgia, Department of Biostatistics and MCG Cancer Center in the amount of $140,000.00 with additional fringes. Provost Phillips recommended a retention increase in an effort to keep Guda at the University but he declined and left the University.

In 2007, plaintiff's salary was $78,044.00.  At the end of 2011, plaintiff's salary was

$98,021.00.[19]  Accordingly, plaintiff's total increase from 2007 until 2011 was $19,977.00.

Plaintiff has had no NIH grants.  Over the past five years, she has been named PI on two grants

from U.S. Civilian Research and Development Foundation for a total of $19,350.00 and was the

subcontractor on a CDC grant in the amount of $73,048.00.  The bulk of the money plaintiff has

brought to the school over the past five academic years has come from MOUs with DOH.  From

2006 through 2007, plaintiff had five MOUs totaling $360,000.00.  For the academic years 2009 -

2010 and 2010 - 2011, plaintiff did not receive a DSI.

## DISCUSSION

## I.      STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56 ( c). Substantive law

determines which facts are material; that is, which facts might affect the outcome of the suit under

the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). A party

moving for summary judgment bears the initial burden of demonstrating that there is no genuine

issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see

Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light

most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden

then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of

material fact requiring a trial. *See id.* If the nonmovant fails to carry this burden, summary

judgment is appropriate. *See id.*

---

[19] Plaintiff alleged that her salary was $89,751.00 when she filed her federal complaint in October 2011 but does not dispute that by the end of 2011, her salary was $98,021.00.

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir.1994). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F .3d 81, 86 (2d Cir.1996) (citing Fed.R.Civ.P. 56( c). In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir.1996) (citation omitted). These determinations are within the sole province of the jury. *Id*.

## II.   EQUAL PAY ACT

The Federal Equal Pay Act ("the EPA") prohibits the payment of unequal wages to employees on the basis of sex.  *Jamilik v. Yale Univ*., 362 F. App'x 148, 149 (2d Cir. 2009).   The EPA provides that:

> No employer having employees subject to any provisions of this section shall discriminate . . . between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

`
29 U.S.C. § 206(d)(1).

To establish a *prima facie* violation of the EPA, a plaintiff must demonstrate that: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal

17

work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Ryduchowski v. Port Auth. of New York and New Jersey*, 203 F.3d 135, 142 (2d Cir. 2000) (citations omitted).  The EPA does not require a plaintiff to establish an employer's discriminatory intent.  *Id.*  (citations omitted).  Whether two positions are "substantially equivalent" for Equal Pay Act purposes is a question for the jury. *Lavin-McEleney v. Marist Coll.,* 239 F.3d 476, 480 (2d Cir. 2001) (citing *Tomka v Seiler Corp.*, 66 F.3d 1295, 1311 (2d Cir. 1995) *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) ("[I]t is for the trier of fact to decide if [there] is a significant enough difference in responsibility to make the jobs unequal.")) .  In *Lavin–McEleney,* the Second Circuit held:

> the proper test for establishing a *prima facie* case in a professional setting such as that of a college is whether the plaintiff is receiving lower wages than the average of wages paid to all employees of the opposite sex performing substantially equal work and similarly situated with respect to any other factors, such as seniority, that affect the wage scale.

*Lanvin-McEleny*, 239 F.3d at 482 (quoting *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983)).

The EPA makes it illegal for an employer to pay unequal compensation to those of different genders for equal work, "except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  *Id.* (citing 29 U.S.C. § 206(d)(1)).  Once the employer proves that the wage disparity is justified by one of the aforementioned affirmative defenses, " the plaintiff may counter the employer's affirmative

defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Id.* (citation omitted).

Plaintiff alleges that comparable male professors, at higher, lower and the same rank, were paid more than plaintiff and that several male professors received larger raises than plaintiff between 2007 and 2011.  Plaintiff compares her salary and raises to Professors Guda, Fitzgerald, Hoff, Kuznetsov, Stratton, Zurbenko and Strogatz.  Plaintiff relies upon the table previously set forth in this decision.  Defendant contends that plaintiff cannot establish a *prima facie* case because she failed to provide evidence that similarly situated male professors with higher salaries performed equal work, that she possessed similar skill and responsibility to those male professors, or that their working conditions were comparable.  Moreover, defendant claims that there were several reasons for the salary differences unrelated to gender.  Defendants rely upon two affidavits from Dean Nasca to establish the factors accounting for the salary differentials among professors. Nasca asserts that rank is the most determinative factor followed by seniority.  In addition, Nasca provided other reasons for the differences in salaries between plaintiff and five male associate professors including grant funding, MOUs, retention offers, professional skill sets and publications.

Nasca identified correspondence he sent to plaintiff after their August 2009 meeting regarding plaintiff's request for a $20,000.00 raise:

> A.   What I did was I told Larry that I wanted - - she had this request for $20,000.  I asked him to do an assessment, which he did, and this was based on the data that he gave me.
>
> Q.   But this is your letter, is that correct?
> A.   Yes.  Obviously, a lot of substance is from him but it is my letter.

Nasca Dep. at p. 106-107.

In *Klein v. New York Univ*., 786 F.Supp.2d 830 (S.D.N.Y. 2011), the District Court for the Southern District of New York addressed this issue in a case with analogous facts and strikingly similar arguments by the defendant in support of summary judgment.  In *Klein*, the plaintiff was a tenured professor teaching accounting at the Stern School of Business who alleged, *inter alia*, that she was underpaid relative to three male accounting professors in violation of the Equal Pay Act. The plaintiff argued that her research, publication record, student evaluations and outside service were comparable to each of the three full professors.  The district court found that the plaintiff established a *prima facie* case noting that:

> The evidence would permit a conclusion that they all performed the same job requiring substantially equal skill, effort and responsibility in similar working conditions as professors in the same department. Although all of the comparators were promoted from associate professor to full professor before Klein, a reasonable jury could find that the skill and effort required to do their work was substantially the same.

*Id.* at 850.

In response, the defendant claimed that the pay disparity was explained by seniority and merit.  The defendant relied upon the declaration of Professor Ingo Walter, who became the Vice Dean of faculty in 2008 and the resumes and faculty activity reports for the three comparators. *Id*.  The Court held that Walter's declaration, alone, was insufficient to, "rule out Klein's theory that she would have received comparable pay but for her gender".  *Id*. at 851.  The Court concluded:

> NYU does not use purely objective or quantitative evidence to determine faculty raises.  Rather, half of a professor's evaluation depends on subjective assessments of his or her research, publication record, and what qualifies as a top-tier journal.  The other factors

20

> taken into consideration arguably are evaluated selectively including student evaluations and service and leadership both inside and outside Stern.

*Klein*, 786 F.Supp.2d at 851.

Because there was no other evidence about how merit increases actually were determined, the Court held that, "[the] issue therefore cannot be decided on the current record". *Id.*

In this matter, defendants acknowledge that Professor Hoff's seniority is comparable to plaintiff and that the professors are equivalent in terms of publishing and funding.  However, defendants claim, "[t]he major factor accounting for the $15,000.00 difference in their salaries resulted from a $20,000.00 retention offer which successfully retained Professor Hoff at UA in the face of a $160,000.00 offer from the University of Pittsburgh."  Plaintiff argues that the record does not support this transaction and that a jury could believe that an undocumented oral offer was not the real reason for the raise.  Moreover, in her opposition to defendants' motion, plaintiff claims that these reasons were never previously communicated.

In Nasca's Reply Declaration Supporting Summary Judgment, he avers:

> Annexed hereto and incorporated herein as Exhibit B is a copy of an unofficial draft letter which Professor Hoff received from the University of Pittsburgh in September of 2008 wherein he was offered an annual salary of $160,000 along with other benefits.  Professor Hoff had provided me a copy of that letter at the time.  As this lawsuit proceeded and I realized I needed a copy of the letter but could not locate it in my files, I requested another copy from Professor Hoff and he provided Exhibit B to me.
>
> Annexed hereto and incorporated herein as Exhibit C is a copy of Professor Hoff's April 4, 2012 memo to me in which he indicates that because he accepted our retention offer he did not pursue the matter further with the University of Pittsburgh and that Exhibit B, the preliminary offer, is all he has.

Nasca also avers that Don Burke, the Dean of the University of Pittsburgh Graduate School of Public Health sent an e-mail confirming the 2008 offer to Professor Hoff.  Nasca annexed that e-mail to his Reply Affidavit as Exhibit D.

The documents annexed to Nasca's Reply Affidavit are not in competent, admissible form.  The record does not contain an affidavit from Professor Hoff or Dean Burke authenticating any of the aforementioned documents.  Moreover, there is no evidence that plaintiff received these documents prior to the filing of the motion for summary judgment.  The record contains no evidence regarding salaries or the factors that are examined when contemplating raises and increases other than Nasca's statements. The record does not contain any declaration or affidavits from any other administrators, male professors, named comparators or otherwise.  Moreover, there is no evidence of any written policy or statement regarding salary determinations or resumes establishing the credentials for the comparators.  Defendants rely solely upon Dean Nasca's affidavit in support of dismissal of plaintiff's Equal Pay claim.

Adopting the reasoning of the court in *Klein* and viewing the evidence in a light most favorable to plaintiff, this issue cannot be resolved on the present record.  This Court finds that there are genuine issues of material fact regarding plaintiff's federal Equal Pay claim to be resolved by a jury.  Thus, defendants' motion to dismiss this claim is denied.

## III.    TITLE VII

Title VII forbids an employer from discriminating against employees with respect to "compensation, terms, conditions, or privileges of employment," or "limit[ing], segretat[ing], or classify[ing] ... employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" on the basis of

race, color, religion, sex or national origin. *Patrolmen's Benevolent Ass'n of The City of N.Y. v. The City of N.Y.*, 310 F.3d 43, 51 (2d Cir.2002) (citing 42 U.S.C. § 2000e-2(a)).  As a matter of law, it is well settled that individual defendants may not be held liable under Title VII. *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir.2004) (internal citations omitted). Accordingly, plaintiff's Title VII claims against Nasca is dismissed.

In analyzing plaintiff's claims of discrimination under Title VII, the Court reviews the record under the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The first step in the *McDonnell Douglas* formulation requires a plaintiff to prove, by a preponderance of the evidence, a *prima facie* case of discrimination or unlawful retaliation by the employer. *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446-47 (2d Cir.1999). If plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 446. In the third step of the *McDonnell Douglas* process, the burden then shifts back to plaintiff to demonstrate that the proffered reason was not the true reason for the employment decision, and that race and/or gender was the true reason. *See id.*

## A.    Equal Pay Claims Against SUNY Albany under Title VII

A claim of unequal pay under Title VII is analyzed under the same framework as a claim under the EPA.  "In order to make out a *prima facie* case of unequal pay for equal work under Title VII, a plaintiff must show that (1) she is a member of a protected class; and (2) she was paid less than non-members of her class for work requiring substantially the same responsibility." *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999).  "[A] Title VII plaintiff must also produce evidence of discriminatory animus in order to make out a *prima facie* case of intentional

23

sex-based salary discrimination." *Id.* (citation omitted). With respect to the intent to discriminate, plaintiff at all times bears the ultimate burden of proof. *Id.* ("[w]hen [the] plaintiff proves that the explanations offered by her employer for wage disparity are false, such does not automatically mean that plaintiff has carried her burden of persuasion on the factor of intent"). "To determine whether a plaintiff has demonstrated a discriminatory animus, a court will examine the entire record to determine 'whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred'". *Cox v. Quick & Reilly, Inc.*, 401 F.Supp.2d 203, 215-16 (N.D.N.Y. 2005) (citing, *inter alia, James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000)).

As discussed in Part II, there are issues of fact with respect to whether plaintiff was paid less than non-members of her class for substantially the same work. However, plaintiff cannot establish a *prima facie* case for unequal pay under Title VII because plaintiff has failed to produce any evidence of discriminatory intent. Evidence that plaintiff's male colleagues were paid a higher salary than plaintiff is insufficient to demonstrate that the disparity resulted from intentional sex-based discrimination. *Sandor v. Safe Horizon, Inc.*, 2011 WL 115295, at *18 (E.D.N.Y. 2011) (citing *Tomka*, 66 F.3d at 1313) (finding that the plaintiff failed to proffer evidence of discrimination where the plaintiff merely relied upon the fact that three men were paid more)). Even assuming plaintiff produced evidence of discriminatory intent, defendant has provided legitimate, non-discriminatory reasons for the disparity in pay. As noted previously, defendant explained that the salaries for professors are based upon a number of factors including rank, seniority, grant funding, retention pay and publications. Based upon the record, defendant met it's burden with respect to introduction of admissible evidence of a "clear, specific, and

non-discriminatory reason" for the wage disparity. *Quarantino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1989).

In response, plaintiff fails to establish that the defendant's proffered reasons are pretext for discriminatory animus. First, she claims that these reasons were not previously explained to her when she requested a $20,000.00 salary increase in August 2009.  This assertion, even if true, does not "undermine the defendant's explanation" for the discrepancy is salaries. *See David v. Comtech PST Corp.*, 2006 WL 2713936, at *15 (E.D.N.Y. 2006) (the plaintiff failed to introduce any evidence from which a trier of fact could conclude that the pay disparity resulted from discriminatory animus).  Plaintiff also argues that Nasca's claim that Hoff was given a substantial raise due to the publication of his book is false because the raise was negotiated over a year before the book was published or reviewed.  Again, even assuming the truth of this allegation, it does not establish discriminatory intent on defendant's part.        Allegations of pretext alone are not enough - there must be evidence that decisions made in regard to plaintiff's compensation were made because of plaintiff's sex. *Belfi*, 191 F.3d at 140.  Plaintiff must provide evidence, other than the fact that some male professors salaries were higher than hers, to support her contention that she was paid less because she was a woman. *See Cox*, 401 F.Supp.2d at 203 (the plaintiff could not cite to any statements, documentary evidence, or other examples of discriminatory practice occurring in support of her contention of gender discrimination). Inconsistent explanations do not constitute proof that defendant intended to discriminate against plaintiff because she was a woman.  Absent that proof, a jury could not simply infer a discriminatory intent. *See Belfi*, 91 F.3d at 140.  Accordingly, the University's motion for summary judgment and dismissal of plaintiff's Title VII unequal pay claim is granted.

**B.**      **Title VII Retaliation Claims Against SUNY Albany**

Title VII forbids an employer from retaliating against an employee for complaining of

employment discrimination:

> It shall be an unlawful employment practice for an employer to
> discriminate against any of his employees or applicants for
> employment ... because he has opposed any practice, made an
> unlawful employment practice by this subchapter, or, because he has
> made a charge, testified, assisted, or participated in any manner in an
> investigation, proceeding or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

In order to establish a *prima facie* case of retaliation, a plaintiff must present evidence that

would permit a rational trier of fact to find that: (1) she engaged in protected participation or

opposition under Title VII; (2) the employer was aware of this activity; (3) the employer took

adverse action against the plaintiff; and (4) a causal connection between the protected activity and

the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

*Kessler v. Westchester County Dep't of Soc. Servs*., 461 F.3d 199, 205-206 (2d Cir.2006) (internal

citations omitted).   In this context, an adverse action is one that "might have dissuaded a

reasonable worker from making or supporting a charge of discrimination."   *Ibok v. Secs. Indus.*

*Automation Corp*., 369 F. App'x 210, 213 (2d Cir. 2010) (citing *Burlington N. & Santa Fe Ry. v.*

*White*, 548 U.S. 53, 68 (2006)). Adverse employment actions are not defined "solely in terms of

job termination or reduced wages and benefits, ... less flagrant reprisals by employers may indeed

be adverse." *Alston v. New York City Transit Auth*., 14 F.Supp.2d 308, 311 (S.D.N.Y.1998)

(citing *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997) (adverse

employment actions are not defined at all, but are left to the court's discretion to make

determinations on a case by case basis)). In a retaliation claim, "[w]hether a particular

reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington*, 548 U.S. at 71 (2006) (internal quotation marks omitted). With respect to the third prong, in *Burlington,* the Supreme Court held that Title VII's substantive provisions and its anti-retaliation provision are not "coterminous".   Rather, the Court held that a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means that it might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id*. at 68.   Title VII's core anti-discriminatory provisions are narrower than Title VII's retaliation provisions and what might not qualify as an adverse employment action under Title VII's anti-discrimination provisions may still violate Title VII's anti-retaliation provisions. *Id*.  Retaliation can be actionable even when the alleged adverse action "had not effected any change in [the employee's] salary, benefits, job, title, grade or hours. *Kessler,* 461 F.3d at 201.  Any reasonable employee that believed that her employers would engage in a concerted effort to drive her from her job if she engaged in Title VII protected activity would think twice about doing so. *Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007).  Although the Court "loosened the standard previously applied in retaliation claims", the *White* standard is still a rigorous one. *Dixon v. City of New York*, 2008 WL 4453201, at *11 (E.D.N.Y. 2008).

Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. *See Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002).  In assessing this phase of the burden-shifting analysis, the Court may not conduct a credibility assessment. *Hicks v. Baines*,

593 F.3d 159 (2d Cir. 2010). If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation. *See id.* The plaintiff, at all times, bears the burden of persuasion. *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033 (2d Cir. 1993). In order to defeat a motion for summary judgment, a plaintiff must show that there is a material issue of fact as to whether the employer's reasons for the action is false and unworthy of belief and, more likely than not, the plaintiff's complaint was the real reason for the action. *Woroski v. Nashua Corp.*, 31 F.3d 105, 108-09 (2d Cir. 1994).

### 1.    Subject Matter Jurisdiction

On October 5, 2009, plaintiff filed a verified complaint with the New York State Division of Human Rights. Plaintiff claimed, "I believe the reason for discrimination was gender-based, followed by retaliation for discussing complaints with administration". Defendant argues that plaintiff is precluded from including a retaliation claim in her Title VII action because the alleged retaliation occurred before she filed this complaint. Moreover, defendant contends that plaintiff failed to identify "a single retaliatory act" in her NYS Division of Human Rights Complaint. Therefore, defendant contends that these claims have not been administratively exhausted and thus this Court lacks subject matter jurisdiction.

In New York, Title VII claims must be filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged discriminatory act. *See* 42 U.S.C. § 2000e–5(e)(1); *see also Butts v. City of New York Dep't of Hous. Preservation & Dev.*, 990 F.2d 1397, 1400 (2d Cir.1993). "A claim is 'reasonably related' to allegations in an administrative charge 'where the conduct complained of would fall within the scope of the [administrative]

investigation which can reasonably be expected to grow out of the charge of discrimination'". *Henny v. New York State*, 842 F.Supp.2d 530, 558 (S.D.N.Y. 2012) (quoting *Butts,* 990 F.2d at 1401). The "substance of the charge" filed with the administrative agency must give the agency "adequate notice to investigate discrimination on [the] bas[is]" alleged by the plaintiff in his Title VII claim. *Id.* (citing *Mathirampuzha v. Potter*, 548 F.3d 70, 76–78 (2d Cir. 2008)).

In this case, plaintiff's Complaint alleges that, "I am a female and I have opposed discriminatory practices in the work place. Because of this, I have been subject to unlawful discriminatory actions". Plaintiff also claims that the most recent act occurred in September 2009 and that she suffered from retaliation for opposing and/or objecting to discrimination. Even though defendant's alleged retaliatory acts were not specifically delineated in plaintiff's NYS Division of Human Rights Complaint, they are "reasonably related" to the allegations in the NYS DHR complaint and would fall within the scope of an EEOC investigation. *Caban v. Richline Group, Inc*., 2012 WL 2861377, at *8, n. 8 (S.D.N.Y. 2012) (citing *Mathirampuzha*, 548 F.3d at 76). Further, plaintiff claims that the retaliation continued after she filed her complaint with the New York State Division of Human Rights. Accordingly, defendant's motion for summary judgment and dismissal of plaintiff's complaint based upon lack of jurisdiction is denied.

## 2.   *Prima Facie* Case

Defendant argues that plaintiff failed to establish any of the four elements necessary to sustain a cause of action for retaliation. Defendant claims that plaintiff did not engage in protected activity because no reasonable person could believe, in good faith, that the contract renewal process for Moslehi violated Title VII and thus, the University was not aware of any

protected activity.  Defendant also contends that plaintiff did not suffer from any adverse action

and that the record does not support causation in several instances of alleged retaliation.

       a.       **Protected Activity in 2008**

Plaintiff alleges that she complained to Fitzgerald about gender discrimination in June or

July 2008 and to Dean Nasca in December 2008.  Defendant argues that plaintiff's June 2008

complaints are not "protected activity" because plaintiff did not have a good faith belief that Title

VII was violated.  Moreover, defendant argues that there is no evidence that plaintiff made any

complaints to Nasca in December 2008.  Defendant concedes that plaintiff engaged in protected

activity in March 2009 when she complained to Provost Susan Philips about gender

discrimination.

To be protected activity, "the plaintiff need not establish that the conduct [ ]he opposed

was actually a violation of Title VII."  *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp*., 136 F.3d

276, 292 (2d Cir.1998). "The law protects employees [who] ... make[ ] informal protests of

discrimination, including making complaints to management, so long as the employee has a good

faith, reasonable belief that the underlying challenged actions of the employer violated the law."

*Gregory*, 243 F.3d at 700-01 (internal citations and quotation marks omitted).  The

reasonableness of plaintiff's belief that the underlying employment practice was unlawful "is to be

assessed in light of the totality of the circumstances." *Galdieri–Ambrosini*, 136 F.3d at 292.

"[I]mplicit in the requirement that the employer have been aware of the protected activity is the

requirement that it understood, or could reasonably have understood, that the plaintiff's opposition

was directed at conduct prohibited by Title VII."  *Id*.  Mere complaints of "unfair treatment by an

individual" are not protected speech under Title VII.  *Filippi v. Elmont Union Free Sch. Dist. Bd.*

*of Educ.*, 2012 WL 4483046, at *16 (E.D.N.Y. 2012) (citation omitted).  "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Id.* (citation omitted).

In this case, Fitzgerald admits that, he had a conversation with plaintiff in June 2008 regarding Moslehi's contract renewal process.  Fitzgerald admits that he stated that Moslehi was not a "team player".  However, Fitzgerald does not recall plaintiff raising the issue of gender discrimination in that meeting.  Fitzgerald testified that in early 2009, plaintiff told him that she, "felt I was - - punishing Professor Moslehi" because she was "an independent woman".  Plaintiff recalls the conversation differently but fails to present any evidence that she complained, in June 2008, that the contract renewal process was discriminatory towards Professor Moslehi due to Moslehi's gender.  Plaintiff fails to cite to any portion of the record including her deposition transcript where she described her complaints to Fitzgerald as relating to Moslehi's gender. Moreover, there are no e-mails or any other documentation in the record supporting plaintiff's claim that she complained to Fitzgerald about gender discrimination.  Plaintiff relies solely upon Fitzgerald's comments that Moslehi was not a "team player" as evidence of gender discrimination because, "Professor Fitzgerald used the term 'not a team player' to describe herself and other women but not men".   This is insufficient to establish that plaintiff engaged in protected activity in opposition to a violation of Title VII or that defendant was aware.   Based upon the record herein, plaintiff has failed to establish, with competent admissible evidence, that she complained that her colleague was the victim of gender discrimination during this conversation with Fitzgerald in June 2008. *See Moccio v. Cornell Univ.*, 2012 WL 3648450, at *39 (S.D.N.Y.

2012) (the plaintiff did not produce evidence that she reasonably believed that at the time she was generally supporting her colleague, that she believed she was engaged in protected activity). Thus, plaintiff cannot establish that she engaged in a protected activity at that time.

Defendant asserts,"there is no evidence plaintiff complained about Moslehi or anything else to Nasca in 2008".  (Dkt. No. 30, Reply Memorandum of Law at p. 8).  Plaintiff failed to respond to this allegation.  The Court has reviewed the record and finds no evidence that plaintiff complained of gender discrimination to Nasca in December 2008.  Accordingly, the Court finds that plaintiff has failed to produce evidence that she engaged in protected activity prior to March 2009.

### b.    Alleged Retaliatory Acts

Even assuming plaintiff could establish that she engaged in protected activity in 2008, defendant claims that plaintiff cannot establish that any of the alleged retaliatory acts constituted adverse actions and in some instances, plaintiff cannot establish causation.  Defendant also claims that, in some instances, defendant had legitimate, non-retaliatory reasons for the actions.  Plaintiff contends that all of the following events, when considered in total, resulted in adverse employment actions sufficient to sustain a cause of action for retaliation.  Moreover, in instances where defendant provides an explanation, plaintiff argues that the reasons are pretextual.

### i.    Research Space[20]

"Although perhaps inconvenient, the relocation of a plaintiff's office does not rise to level of an adverse employment action."  *Cunningham v. New York State Dep't of Labor*, 2010 WL

---

[20]  Based upon the record, the renovations and relocation of plaintiff's confidential files and research papers began  prior to plaintiff's protected activity.  However, the dispute regarding her workspace continued to evolve throughout 2009 and for the "following several years".  Accordingly, the Court considers this alleged retaliatory act as timely, under the circumstances

1781465, at *6 (N.D.N.Y. 2010) (the plaintiff alleged the relocation of his office from the fifth

floor to the first floor constituted an adverse employment action because offices on the fifth floor

were more prestigious, he needed to keep the blinds in his new office closed in order to have

privacy, and visitors were discouraged from stopping by due to the additional security measures

for entering the first floor); *see also Fercello v. County of Ramsey,* 612 F.3d 1069, 1078 -1079 (8th

Cir. 2010) (the plaintiff offered no evidence that the relocation of her office to one without a

window rendered her unable to complete her duties or that it otherwise interfered with her

employment to an extent that would deter a reasonable person from making a harassment claim).

Here, plaintiff claims that in early 2009, plaintiff's confidential files and research papers,

which were located in a research office shared with Strogatz on the first floor of the Georgia

education building, were relocated due to the renovations.  Plaintiff moved her files and research

materials to her faculty office and as a result, claims that her office became unusable.  Plaintiff

claims that she was only given one cubical for research so, "everyone got creative" and held

meetings at Starbucks, the student lounge and other vacant cubicles.  Plaintiff testified that she

worked from home because she lost her ability to work at SPH as she had no functional space.

Plaintiff does not dispute that locked space was provided for all faculty in the basement

for their confidential files. Plaintiff testified that she was told that if she wanted to put her files in

the basement that she was responsible for purchasing a filing cabinet with a locking bar.  Preston

avers that faculty members were advised, "that it might be prudent to lock their individual

cabinets, since other people would have access to the shared secure area".  Preston further

asserted, "[n]one of the other professors contended that they needed any additional storage space

than was provided for them in conjunction with the renovations". At a later time, plaintiff opted to move her materials to Moslehi's office. Plaintiff testified:

> A. All the materials were basically put in my office, making my office completely unusable and actually a fire hazard for anyone. Everything stayed there. And then I tried to problem solve. I approached Dr. Moslehi because she was given a second office in our building and asked if I could use some of that space to make my space more usable.

The parties present different accounts of what transpired while plaintiff's materials were stored in Moslehi's office. Defendant claims that plaintiff did not comply with procedures to obtain a key to Moslehi's office. Plaintiff claims that defendant intentionally complicated the matter with paperwork and confusing rules.

Even viewing the evidence in a light most favorable to plaintiff, a reasonable jury could not find that plaintiff suffered a materially adverse employment action as a result of the relocation of her materials and renovations. Indeed, plaintiff offers nothing more than conclusory assertions that the renovations resulted in a materially adverse action. Plaintiff asserts that the situation created an adverse employment action because she was hampered in her ability to write, research, consult with students or prepare her lesson plans. However, there is no evidence supporting these assertions. *See Klein*, 786 F.Supp.2d at 849 (the plaintiff failed to establish that the failure to assign a new office was a materially adverse employment action as there was no evidence that the plaintiff was injured or harmed by not receiving better lighting or improved views).

In response, defendant claims that it had a legitimate, non-retaliatory reason for relocating plaintiff's graduate assistant and research space due to the renovations. *See Spector v. Bd of Trustees of Community Tech Coll.,* 316 F. App'x 18, 21 (2d Cir. 2009) (the plaintiffs complained about office relocations, but the defendants offered evidence that the relocations were required to

make room for the college's nursing division); *see also Sullivan v. Catholic Univ. of Am.*, 387 F.Supp.2d 11, 14 (D.D.C. 2005) (the defendant had a legitimate reason to move plaintiff's office as part of office reorganization). Plaintiff does not respond to defendant's explanation nor does plaintiff argue that defendant's reasons are merely pretext for defendant's retaliatory motives. Plaintiff does not address the renovation nor does she provide any evidence to suggest that other employees were not affected by the renovations. *See Sullivan*, 387 F.Supp.2d at 14 (the plaintiff only stated that she was "unaware of other relocations" but failed to offer any evidence). When asked whether anyone else was displaced due to the renovation, plaintiff testified, "It doesn't mean they weren't, I just don't know of anyone else".

The facts of this case are distinguishable from *Lorenzo v. St. Luke's-Roosevelt Hosp. Ctr.*, 837 F.Supp.2d 53 (E.D.N.Y. 2011), a case cited by plaintiff in support. In *Lorenzo*, the defendant relocated the plaintiff from a private office to an open cubicle setup. *Id.* at 69. The Court held that this act was materially adverse because, "[a] private office is a valuable commodity". The Court also found that plaintiff established that the move had adverse affects on her job responsibilities and condition of employment because she had to answer the phone several times each day, had to coordinate her work and vacation schedule with the receptionists to ensure phone coverage at the office, and had to walk back to her former office each time she needed to access her accounting files. *Id.* Here, plaintiff has not established that the relocation of her graduate assistant or files resulted in any adverse impact on her responsibilities or conditions of employment. Thus, plaintiff cannot sustain a cause of action for retaliation under Title VII based upon this alleged act.

### ii.   Discretionary Salary Increases

Plaintiff claims that defendant withheld discretionary salary increases in 2010 and 2011 in retaliation for her complaints.  Defendant does not address these arguments and did not present any legitimate, non-retaliatory reason for the actions.  The failure to receive a discretionary salary increase can constitute an adverse action.  *Butts*, 2007 WL 259937, at *16.  Based upon the record and defendant's failure to address the issue, there is a genuine issue of fact with respect to whether defendant took this action in retaliation for plaintiff's complaint of discrimination.

### iii.    Delayed Payment of $5,000.00 Raise

Plaintiff claims that Nasca promised to increase plaintiff's salary by $5,000.00 in 2009 but withheld the raise until late 2010.  Defendant does not address this argument and did not present any legitimate, non-retaliatory reason for the actions.  Plaintiff cites to Nasca's Declaration submitted in support of the within motion and Nasca's September 1, 2009 e-mail to plaintiff with the subject line, "Request for salary adjustment".   In the e-mail, Nasca denied plaintiff's request for a $20,000.00 salary increase.  In Paragraphs 50 and 51 of the declaration, Nasca states:

> The memo speaks for itself. Suffice it to say that even though her salary at the time, $89,251 per year, compared favorably to others internally as well as the national averages, I was prepared to increase it by another $5,000. I see part of my role as doing what I can within the limits of my position to enhance the productivity and, hopefully, reputation of the program. These goals are not advanced by a disgruntled employee who impacts negatively on the morale of the entire school. It was my hope that Professor McNutt would see the increase as a positive thing and her morale would improve.
>
> We delayed implementing the salary increase while in settlement negotiations with her, but when Professor McNutt started this federal lawsuit, we concluded that settlement was out of the question and simply gave her the raise in late 2010, retroactive to September of 2009.

36

Based upon the record and defendant's failure to articulate any argument in support of dismissal of this claim, summary judgment and dismissal of plaintiff's retaliation claim, based upon this act, is not warranted.

### iv.    MOU 418 and loss of $43,000.00 in Funding

Plaintiff argues that defendant intentionally delayed the processing and invoicing for MOU 418 resulting in a loss of funding to plaintiff in the amount of $43,000.00.  The MOU began on April 1, 2009 and terminated on October 31, 2010.  The agreement was executed by the DOH on November 30, 2009 but was not signed by Applegate, on behalf of Nasca, until March 9, 2010.  Plaintiff claims that defendant intentionally delayed the processing resulting in a loss of approximately $43,000.00 in funding, in retaliation for plaintiff's complaints of discrimination. Defendant contends that plaintiff retrieved the MOU from the Controller in March 2010 and kept the documentation until February 2011.  As a result, state funds for the 2010 fiscal year were no longer available.   Debra Oriola provided a Declaration in support of defendant's motion for summary judgment and asserts:

> In or about February of 2011, Professor McNutt came to me and said, in sum or substance: " I have an MOU I need to bill. Can you help? It's old."
>
> She showed me two original versions of the MOU.
>
> I looked in my files and did not have a copy of the MOU.
>
> I also checked the Excel file I use to keep track of SPH MOUs and there was no record of it there.

Oriola also, "telephoned the accounting office at UA and learned from Karen Lehoe that they had no record of billing for MOU 418."  While Oriola describes her unsuccessful efforts to

locate the MOU documentation, she does not offer any explanation regarding why the MOU documentation was missing.

As the record reflects, the parties present drastically different accounts of the process involving the execution and funding of MOU 418.   Viewing the evidence in a light most favorable to plaintiff, the Court finds that a reasonable jury could find in plaintiff's favor on this issue.  Thus, defendant's motion for summary judgment and dismissal of plaintiff's retaliation claim, on this basis, is denied.

### v.    Colleagues' Hostility

Plaintiff claims that defendant distributed her attorney's submission to the New York State Department of Human Rights to female faculty members to intentionally "anger" the female faculty to create animosity towards plaintiff.  Defendant claims that it solicited a response from female professors and administrators to rebut plaintiff's "submissive" allegations.

Petty slights, minor annoyances, and simple lack of good manners will not deter a worker from making a charge of discrimination. *See Burlington Northern*, 548 U.S. at 68; *see also McWhite v. New York City Housing Auth.*, 2008 WL 1699446, at *13 (E.D.N.Y.2008) (holding that allegations that a supervisor ordered employees not to speak with the plaintiff is a type of "minor annoyance" that would not deter a reasonable person from filing a charge of discrimination).  Plaintiff has failed to establish how distributing the letter to female faculty and staff and any subsequent treatment by her co-workers resulted in any adverse employment action. Thus, plaintiff cannot establish a *prima facie* case of retaliation as to this claim. Therefore, defendant is entitled to summary judgment and dismissal of plaintiff's Title VII retaliation claims based upon this alleged act.

### vi.    Critical Thinking Seminar

Defendant argues that plaintiff cannot sustain a cause of action based upon her claims that Fitzgerald created a Critical Thinking Seminar in the Fall of 2009 in retaliation for plaintiff's complaints of discrimination.  Plaintiff failed to respond or address this argument.  As discussed in Part II(B)(b)(v), petty slights or minor annoyances are not actionable.  Moreover, with respect to this issue, plaintiff has failed to establish that she suffered any adverse actions or consequences.  Plaintiff is essentially complaining about what can only be deemed an extracurricular activity.  *See Drakeford v. Alabama Co-op. Extension Sys.,* 416 F.Supp.2d 1286, 1314 (M.D.Ala. 2006) (teaching Political Science was not what the plaintiff was employed to do so it, "ma[de] sense to the court that [the] [d]efendants would want to assert some positive control over what really amounts to a privilege, rather than a job entitlement).   The issue is whether defendant's control over plaintiff's seminar amounts to an adverse employment action.  *See id.* Here, no reasonable juror could conclude that it was.  Plaintiff admits that she was not reprimanded or disciplined as a result of this issue and concedes that she did not change the meeting time for her seminar.  Thus, defendant's motion for summary judgment and dismissal of plaintiff's retaliation claim, based upon this act, is granted.

### vii.    Withdrawal of Teaching Assistant for EPI 612

Plaintiff claims that defendant withdrew the offer of Teaching Assistant for Epi 612 in Fall 2008 after plaintiff complained of gender discrimination.  Plaintiff cannot rely upon this alleged retaliatory act regarding the Teaching Assistant for the Fall 2008 because the event pre-dates plaintiff's protected activity and her DHR complaint by 300 days.  Even assuming the claim

was timely, plaintiff cannot establish that she suffered from an adverse action.  Accordingly, plaintiff cannot rely upon this act to support her retaliation claims.

    **viii.    Requirement that plaintiff teach EPI 602 in Spring 2010**

        Plaintiff claims that Fitzgerald told plaintiff in the Fall of 2009 that she would be required to teach EPI 602 in the Spring of 2010.  Plaintiff claims that this was in retaliation for plaintiff filing her complaint with the NYS DHR and relies on temporal proximity arguing that Fitzgerald did not reassign the class when plaintiff resigned but only after she filed her complaint with the NYS Division of Human Rights.  Defendant argues that this action, even if it qualifies as an adverse employment action, was trivial.

        A change in teaching responsibilities can constitute an adverse action if it is "materially less prestigious, materially less suited to [a plaintiff's] skill and expertise, or materially less conducive to career advancement." *Galabaya v. New York City Bd. Of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000) (collecting cases).  However, "mere dissatisfaction with[a] teaching schedule is not sufficient to support a finding of a material adverse action".  *Klein*, 786 F.Supp.2d at 849; *but cf. Curley v. St. John's Univ.*, 19 F.Supp.2d 181, 190 (S.D.N.Y. 1998) (the decision to assign the plaintiff only undergraduate courses did not change his compensation, benefits, nor tenure status but the switch from being a graduate instructor to an undergraduate instructor was /tantamount to a demotion or punishment and evidence was sufficient to prove to a reasonable fact finder that graduate teaching is more prestigious and leads to more professional growth opportunity).

        Here, plaintiff presents no evidence establishing that she suffered from an adverse employment action as a result of this assignment.  The class was a one credit seminar that met once a week.  Moreover, plaintiff has failed to produce any evidence that defendant was obligated

to obtain plaintiff's approval before she was assigned certain classes.  *See Moccio*, 2012 WL

3648450 at *41 (there was no evidence that the defendant was obligated to obtain the plaintiff's

approval as to who would be her supervisor, her office assignments, which group she was

assigned to, or as to day-to-day business activities).   Further, defendant offered legitimate, non-

retaliatory reasons for the assignment.   Defendant asserts that because plaintiff only served as

associate chair for one of two years, she had not fulfilled her obligations.   Therefore, defendant

claims that Fitzgerald was not obligated to provide course relief.   Plaintiff does not respond to

this argument and has failed to produce any evidence of pretext.   Accordingly, defendant's motion

for summary judgment and dismissal of plaintiff's retaliation claim, based upon this act, is

granted.

> **ix.    Exclusion from investigation into student cheating and participation in SPH
> activities**

Plaintiff claims that defendant "isolated and ostracized plaintiff, ignoring her in the halls"

and refusing to allow her to participate in departmental activities including being excluded from

the investigation into the "cheating incident".   These alleged acts do not constitute adverse

actions.   Courts in this Circuit have consistently held that allegations that a plaintiff has been

ostracized and isolated by her co-workers or excluded from important meetings are insufficient to

establish an adverse employment action.  *Wallace v. New York State Dep't of Corr. Servs*., 2006

WL 2134644, at *9 (W.D.N.Y. 2006); *see also Carpenter v. City of Torrington*, 100 F. App'x

858, 860 (2nd Cir. 2004) ("silent treatment" does not amount to a "materially adverse change in

the terms and conditions of employment"); *Sgarlata v. Viacom, Inc*., 2005 WL 659198, at *6

(S.D.N.Y. 2005) (the plaintiff's interactions with his supervisor or co-workers can not be

considered adverse employment actions sufficient to sustain his retaliation claim).   In addition,

plaintiff has not offered any evidence that she excluded from the cheating investigation was causally related to her complaints about discrimination. *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, 2007 WL 1149979, at *9 (S.D.N.Y. 2007). Plaintiff failed to produce any evidence that defendant was required to include plaintiff in any discussion or investigation regarding student cheating. *See Moccio*, 2012 WL 3648450 at *41.

To summarize, a pattern of retaliatory harassment can rise to the level of a Title VII violation but a plaintiff must offer more than conclusory allegations of retaliatory motive. Here, plaintiff's dissatisfaction with aspects of her employment at the University is insufficient to establish a material adverse action for the purposes of retaliation. *See Klein*, 786 F.Supp.2d at 849. According, these actions, even when viewed collectively, are not actionable.

## IV.   New York Human Rights Law

New York State Human Rights Law § 296 provides that:

> "[i]t shall be an unlawful discriminatory practice: [f]or an employer [t]o discriminate against any person in his pursuit of such programs or to discriminate against such person in the terms, conditions or privileges of such programs because of race, creed, color, national origin, sex, age, disability or marital status."

According to the Second Circuit, "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII". *Torres v. Pisano*, 116 F.3d 625, 629, n. 1 (2d Cir.1997), *cert. denied*, 522 U.S. 997 (1997); *see also Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714-716, n. 6 (2d Cir. 1996). Although individuals are not subject to liability under Title VII, they may be liable under the NYSHRL if they were personally involved in the conduct giving rise to the claim. *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000). It is generally accepted, however, that once an employer has been found to have not discriminated,

there is no predicate for imposing liability on the supervisors under an aiding and abetting theory. *Yerry v. Pizza Hut of Southeast Kansas*, 186 F.Supp.2d 178, 187 (N.D.N.Y .2002) (citing *Falbaum v. Pomerantz*, 19 F. App'x 10 (2d Cir. 2001)).

Defendants argue that plaintiff's HRL claims against the University and Nasca, in his official capacity, are barred by the Eleventh Amendment.  Plaintiff did not respond and confined her response to Nasca's involvement as an aider and abettor.  For purposes of the Eleventh Amendment, "SUNY 'is an integral part of the government of the State [of New York] and when it is sued the State is the real party.' " *Jungels v. State Univ. Coll. of New York*, 922 F.Supp. 779, 784 (W.D.N.Y. 1996) (quoting *Dube v. State Univ. of New York*, 900 F.2d 587, 594 (2d Cir. 1990)).   Therefore, absent consent to suit in federal court on the part of the State, this court has no jurisdiction over the plaintiff's Human Rights Law claims against SUNY and Nasca, in his official capacity.  *See Kentucky v. Graham*, 473 U.S. 159, 165–67 & n. 19 (1985) (the immunity enjoyed by the states under the Eleventh Amendment also extends to state officials sued in their official capacities, and bars "a suit seeking money damages from a State official in his official capacity").

However, plaintiff has also asserted Human Rights Law claims against Nasca in his individual capacity.  Plaintiff argues that Nasca is liable, through is direct participation in awarding salary increases to men and in acts of retaliation, as an aider and abettor in violation of HRL § 296(6).  Section 296(6) states that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."  Under New York law, "liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor."

43

*Martin v. New York State Dep't of Corr. Servs*., 224 F.Supp.2d 434, 442 (N.D.N.Y. 2002) (citation omitted) (while the plaintiff is barred from recovering against DOCS on Eleventh Amendment immunity grounds, he is not barred from establishing that DOCS,  through its agents, aided, abetted, incited, compelled or coerced the plaintiff's co-workers into harassing or retaliating against him).   The Second Circuit has held that § 296(6) offers a basis for employee liability for employees who "actually participated in the conduct giving rise to a discrimination claim" even if they have neither an ownership interest nor the power to hire and fire. *See Tomka,* 66 F.3d at 1317.

As the Court previously discussed, some of plaintiff's retaliation claims involving salary and discretionary raise issues survive the motion summary judgment.   In this regard, plaintiff claims that Nasca was a clear participant in these acts as he withheld the $5,000.00 raise and denied plaintiff her DSI raises in 2009, 2010 and 2011.  These allegations are sufficient to create an issue of fact as to whether Nasca participated in the conduct giving rise to her retaliation claims.  *See Stathatos v. Gala Resources, LLC,* 2010 WL 2024967, at *8 (S.D.N.Y. 2010). Accordingly, defendant Nasca's motion for summary judgment as to plaintiff's HRL claims against is denied.

## VI.    Equal Protection

Defendant Nasca moves for summary judgment and dismissal of plaintiff's Equal Protection claims.  Plaintiff alleges that defendants deprived her of her constitutional right of Equal Protection under the Fourteenth Amendment based upon the same evidence that establishes that plaintiff was subjected to disparate treatment because of her gender. The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated

should be treated alike". *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Sex-based discrimination may be actionable under § 1983 as a violation of equal protection. *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (concluding that § 1983 and the Equal Protection Clause protect public employees from various forms of discrimination including hostile work environment and disparate treatment on the basis of gender).  Retaliation for complaining of gender discrimination is not an Equal Protection clause violation.  *See Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir.1988).

In this case, plaintiff has not proffered any additional facts as the basis for this claim other than those previously considered by this Court. The Court has granted defendant's motion for summary judgment and dismissal of plaintiff's Title VII sex-based equal pay claims.  "To the extent plaintiff's equal protection claim is based upon an alleged discrimination in pay, it must be dismissed for the reasons set forth above in the discussion of plaintiff's gender pay discrimination claims". *Heap v. County of Schenectady*, 214 F.Supp.2d 263, 272 (N.D.N.Y. 2002). Plaintiff's remaining retaliation claims do not give rise to an Equal Protection claim. Accordingly, all defendants are entitled to summary judgment and dismissal of plaintiff's Equal Protection claims.[21]

## CONCLUSION

**It is hereby**

**ORDERED**, that defendants' motion for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 25) is granted in part and denied in part; it is further

**ORDERED**, that plaintiff's Title VII claims against Nasca are dismissed; it is further

---

[21] Based upon the Court's ruling on this issue, defendant Nasca's motion for summary judgment and dismissal of plaintiff's Equal Protection claim, based upon qualified immunity, it moot.

**ORDERED**, that defendant SUNY Albany's motion for summary judgment and dismissal of plaintiff's Title VII equal pay claims based upon gender discrimination against SUNY Albany is **GRANTED**; it is further

**ORDERED** that the University's motion for summary judgment (Dkt. No. 25) and dismissal of plaintiff's Title VII claims for retaliation based upon the following alleged retaliatory acts: (1) research and office space; (2) defendant's attempt to turn plaintiff's colleagues against her; (3) Critical Thinking Seminar in Fall 2009; (4) withdrawal of promised teaching assistant for Epi 612; (5) assignment to teach EPI 602 in Spring 2010; and (6) exclusion from SPH activities and from investigation into student cheating are **GRANTED**; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 25) and dismissal of plaintiff's Title VII claims for retaliation based upon the following alleged retaliatory acts: (1) withholding of discretionary salary increases; (2) delayed payment of $5,000.00 raise; (3) loss of $43,000.00 in funding from MOU 418; is **DENIED**; and it is further

**ORDERED**, that defendants' motion for summary judgment and dismissal plaintiff's HRL §296 claims against the University and Nasca, in his official capacity, is **GRANTED**; and it is further

**ORDERED**, that defendant's motion for summary judgment and dismissal of plaintiff's HRL §296(6) claim against Nasca, in his individual capacity, is **DENIED**; and it is further

**ORDERED**, that defendants' motion for summary judgment and dismissal of plaintiff's Equal Protection claims is **GRANTED**; it if further

**ORDERED**, that defendants' motion for summary judgment and dismissal of plaintiff's complaint is **DENIED** in all other respects.

**ORDERED** that a Settlement Conference is scheduled in this matter for March 25, 2013 at 10:00 a.m. in Albany.  The parties are directed to appear at that time and make submissions in advance of the conference as directed in this Court's Order Setting Settlement Conference which will be forthcoming.

**IT IS SO ORDERED.**

Dated:  January 17, 2013
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

47